UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

**TIMOTHY M. TURNER**                                                    **PLAINTIFF**

**V.**                                            **CIVIL ACTION NO. 3:20-CV-00813-JHM**

**HELEN R. LONG,** *et al.*                                            **DEFENDANTS**

### MEMORANDUM OPINION AND ORDER

This case comes to the Court on remand from the Sixth Circuit. (DN 45). Currently pending before the Court is Defendants' motion for partial summary judgment. (DN 55). This matter is fully briefed and ripe for decision. For the following reasons, Defendants' motion for partial summary judgment is granted in part and denied in part.

### I. BACKGROUND

Plaintiff Timothy M. Turner, a convicted inmate filed a *pro se* civil rights complaint under 42 U.S.C. § 1983 against Defendants Helen R. Long, Benjamin Harlan, and Berton Bare (collectively, Defendants) alleging constitutional violations arising from events occurring while he was incarcerated at the Luther Luckett Correctional Complex (LLCC). (DN 1). Therein, Plaintiff alleged, *inter alia*, that Defendants: (1) violated his Eighth Amendment rights by failing to provide him with size-appropriate paper boxers, causing his boxers to become unsanitary; (2) violated his Fourth Amendment rights by failing to replace his failing paper boxers, causing him to expose himself to others; and (3) violated his Eighth Amendment rights by being deliberately indifferent to his safety by allegedly telling other prisoners that Plaintiff was a confidential informant. (*Id.*). Upon initial review of the complaint pursuant to 28 U.S.C. §1915A, the Court permitted the above claims to proceed. (DN 7).

Following the completion of discovery (DN 21), Plaintiff filed a pre-trial memorandum. (DN 23).  Defendants then moved for summary judgment (DN 32), to which Plaintiff responded (DN 33) and Defendants replied (DN 34).  The Court granted Defendants' motion for summary judgment.  (DN 40).

Plaintiff timely appealed the Court's judgment dismissing the case to the United States Court of Appeals for the Sixth Circuit.  (DN 42).  On June 17, 2024, the circuit court reversed and remanded to this Court Plaintiff's Eighth Amendment prison conditions claim, his Fourth Amendment bodily privacy claim, and his Eighth Amendment deliberate indifference/failure-to-protect claim.  (DN 45).  This Court subsequently ordered additional briefing and permitted the Defendants to submit an additional summary judgment motion.  (DNs 47 and 50).

Defendants' motion for summary judgment is now before the Court.  (DN 55).  Therein, they seek dismissal of Plaintiff's Eighth Amendment prison conditions claim and his Fourth Amendment bodily privacy claim.[1]  (*Id*.).  In support of their motion, Defendants rely on their previous motion for summary judgment and attached exhibits (DNs 32-1 through 32-16), and submit the sworn affidavits of Scott Jordan, former Warden of LLCC; Defendant Helen Long, Unit Administrator at LLCC; and Defendant Benjamin Harlan, Unit Administrator at LLCC.  (DNs 55-2 through 55-4).

Plaintiff, through counsel, has responded to the motion (DN 60).  In support of his response, Plaintiff relies on his complaint with attachments (DN 1), and his affidavit (DN 33).  Plaintiff also submits the declaration of attorney Daniel J. Canon, Esq. (DN 60-1).  Defendants have filed a reply.  (DN 61).

---

[1] The parties agree that further discovery is necessary for Plaintiff's Eighth Amendment deliberate indifference/failure to protect claim against Defendant Bare.  (DN 60-1; DN 61, PageID.615).  Accordingly, this Memorandum Opinion and Order addresses only the two claims upon which Defendants have sought summary judgment.

The undisputed facts are as follows:

At the time of the complained-of events, Plaintiff, a 350-pound inmate, was incarcerated at LLCC.  (DN 1, PageID.5).  Due to a pending disciplinary report, Plaintiff was confined to the facility's Restrictive Housing Unit (RHU) from June 8, 2020, through August 14, 2020. (DN 55-4).  While in the RHU, Plaintiff was confined to his cell for 23 hours per weekday, and 24 hours per weekend day.  (DN 1, PageID.9).

The RHU houses inmates who are removed from the prison's general population for a variety of reasons, including disciplinary violations, protective custody, suicide watch, and pending transfer to another facility.  (DN 55-3).  In 2018, in response to a series of suicide attempts, the LLCC Warden's Office instituted a policy that all inmates assigned to the RHU, regardless of reason, be issued a security blanket and security smock instead of standard-issue clothing ("RHU Clothing Policy" or "Clothing Policy").  (DNs 32-10, 32-13, 55-2, 55-3, 55-4).  The RHU Clothing Policy, ordered by then-Warden Scott Jordan ("Jordan"), was understood by Defendants to also mandate the issuance of paper-boxer underwear.  (*Id.*).

Defendants Long and Harlan were Unit Administrators in the RHU, responsible for distributing paper boxers to RHU inmates, who would be offered "clean, new, size-appropriate paper boxers 3-4 times a week when they [took] showers, and upon request if needed." (DNs 55-3, 55-4).

On June 26, 2020, due to supply-chain issues, the RHU ran out of paper boxers in Plaintiff's XXXL size.  (DN 55-4).  By June 29, 2020, Plaintiff had been wearing the same paper boxers for five consecutive days.  (DN 1, PageID.5; DN 1-1, PageID.16).  At that time, Plaintiff told Long and Harlan that his paper boxers were stained with urine and feces, "had a foul odor," and asked for new boxers.  (*Id.*).  Long informed Plaintiff that paper boxers in his size, XXXL, were

backordered.  (DN 55-3).  Plaintiff requested to wear cloth boxers from his personal property until the proper size-XXXL paper boxers became available.  (DN 1, PageID.5).  Long and Harlan refused his request, offering to provide smaller-sized L or XL paper boxers.  (*Id*.; DNs 55-3, 55-4).

Thereafter, each time Plaintiff took a shower, Long offered him a new pair of clean smaller sized paper boxers.  (DNs 55-3, 55-4).  Plaintiff refused to try to put them on, knowing that wearing smaller boxers was like "putting a square peg in a round hole" and that "it could not be done." (DN 33).

On July 1, 2020, Plaintiff filed a written grievance asking that he be allowed to "wear regular clothes suitable for RHU so that I wont [sic] have to wear nasty and falling apart underwear," which was rejected by an LLCC grievance coordinator.  (DN 1-1, PageID.16-17; DN 23-8).

By July 15, 2020, Plaintiff had still not received clean underwear, despite "begging and pleading daily for relief."  (DN 1, PageID.5, 11).  Although Plaintiff had been issued a suicide smock that was meant to cover prisoners to the mid-thigh, Plaintiff states that the Velcro that held it together was not strong enough to hold it closed over his 350-pound body, and that the smock did not always cover his buttocks and genitals, particularly at night when the smock would ride up as he moved in his bed "exposing his nakedness" in full view of his cellmate and a security camera for others to view.  (DN 33).  After 22 days without clean underwear, Plaintiff's soiled boxers were falling apart and were "destroyed" from "water, urine or feces."  (DN 33).  Plaintiff was again offered size-L boxers on July 15, 2020.  This time, he attempted to put them on, but "could not pull them all the way up for fear of them busting apart."  (DN 1, PageID.5; DN 1-1, PageID.20). Plaintiff "embarrassingly walked down the hall to his room" with several men heckling him and

4

making sexually explicit comments. (*Id.*). When Plaintiff arrived at his cell and sat on his bed, the size-L paper boxers "came apart at the seam." (DN 1, PageID.5-6).

The following morning, on July 16, 2020, Plaintiff told Harlan that his boxers were "completely ripped out" and showed him his bare buttocks to illustrate the problem. (DN 1, PageID.5-6). According to Plaintiff, Harlan simply responded, "Nice." (*Id.*). On the same day, Plaintiff went to recreation. While exercising, Plaintiff became "hot and sweaty" and took off his security smock. (*Id.*, PageID.6). Because his paper boxers were "completely ripped," his bare "buttocks and genitals" were exposed to everyone in recreation and to security cameras. (*Id.*). Other prisoners started heckling Plaintiff with "l[ewd] and sexual[ly] motivated statements." (*Id.*). Plaintiff states that he asked Bare, who was present and heard these comments, for help filing a Prison Rape Elimination Act (PREA) request. Bare informed him that this was not a PREA situation and said, "looks like your ass is out of luck." (*Id.*). Plaintiff said this resulted in other prisoners making additional "obscene statements and comments." (*Id.*).

At this time, RHU Captain Sarah Crawford ("Crawford"), who is not a party to this action, arrived at the recreation area. Plaintiff states that he showed Crawford his buttocks through his ripped boxers and requested a pair of cloth boxers from his personal property. (*Id.*, PageID.6-7). Approximately fifteen minutes later, Crawford brought Plaintiff his personal cloth boxers, which he had been requesting for nearly three weeks—since June 26, 2020. In a sworn affidavit, Crawford attests that Plaintiff was laughing about the situation, that she only saw a small rip and saw no skin or "private parts." (DN 32-10). Crawford contacted the Deputy Warden for Security, Patricia Gunter ("Gunter"), who authorized her to issue Plaintiff a pair of his personal cloth boxers until the size-XXXL paper boxers were back in stock. Plaintiff was provided a second pair of personal boxers to wear while his other pair was being washed. (*Id.*).

Plaintiff continued to wear his cloth boxers until the size-XXXL paper boxers were restocked.  (DNs 32-10, 32-12, 55-3).

## II.  LEGAL STANDARD FOR SUMMARY JUDGMENT

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of specifying the basis for its motion and identifying the portion of the record that demonstrates the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]"  Fed. R. Civ. P. 56(c)(1).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  *Anderson*, 477 U.S. at 252.

### III. DISCUSSION

#### A. Personal Involvement

Defendants first seek summary judgment as to the claims against Bare for lack of his participation in the conditions of Plaintiff's confinement or his bodily privacy exposure. (DN 55-1, PageID.529).

As an initial matter, § 1983 creates no substantive rights but merely provides remedies for deprivations of rights established elsewhere. *Flint ex rel. Flint v. Ky. Dep't of Corr.*, 270 F.3d 340, 351 (6th Cir. 2001). Two elements are required to state a claim under § 1983. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). "[A] plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). "Absent either element, a section 1983 claim will not lie." *Christy v. Randlett*, 932 F.2d 502, 504 (6th Cir. 1991).

"Section 1983 imposes liability only on a defendant who was personally involved in the unconstitutional action that caused the plaintiff's injury." *Pineda v. Hamilton Cnty., Ohio*, 977 F.3d 483, 491 (6th Cir. 2020); *see also Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012) ("Persons sued in their individual capacities under § 1983 can be held liable based only on their own unconstitutional behavior."); *Gibson v. Matthews*, 926 F.2d 532, 535 (6th Cir. 1991) (noting that personal liability "must be based on the actions of that defendant in the situation that the defendant faced, and not based on any problems caused by the errors of others, either defendants or non-defendants"). On summary judgment, "Rule 56 requires a plaintiff confronting a summary-judgment motion to present evidence from which a jury could conclude that it was more likely than not that a defendant was involved." *Pineda*, 977 F.3d at 491.

7

Defendants submit Bare's affidavit in support of their argument that he had no role in the conditions of Plaintiff's confinement or his bodily exposure. (DN 55-1, PageID.529-30). Bare attests that he was assigned to the Internal Affairs unit, and not the RHU, and was not involved in implementing the RHU Clothing Policy, which includes the issuance of paper boxers and security smocks to inmates. (DN 32-4). Bare goes on to state that he had one interaction with Plaintiff in which Plaintiff complained about the size of the paper boxers issued to him but made no complaint about the cleanliness of the boxers. (*Id.*). After speaking with Long regarding the boxer supply issue, Bare returned to the recreation area and advised Plaintiff that the plus-sized boxers were on back order. Bare states that he heard no "heckling, sexually explicit, or inappropriate comments from other inmates or staff directed at or about [Plaintiff] regarding the alleged exposure of his buttocks and genitals." (*Id.*).

Plaintiff responds that Bare's comments toward Plaintiff sufficiently establish Bare's personal involvement. (DN 60, PageID.589). Specifically, he asserts that Bare witnessed Plaintiff "getting heckled and made fun of with comments of a sexual nature." (DN 1, PageID.6). Plaintiff asked Bare if he could help him by filing a PREA complaint because "he shouldn't be made to wear. . . large paper boxers that don't fit and show pure nudity of plaintiff's body including his bare buttocks and genitals." (*Id.*). Bare responded that it was "'not a PREA and looks like your ass [is] out of luck!'" (*Id.*). Plaintiff states that several inmates then "laughed and began saying obscene statements and comments." (*Id.*).

Additionally, Plaintiff's exhibits contain a grievance stamped July 20, 2020, on which Plaintiff wrote, "[o]n Thursday, [July] 16th my shorts totally busted out in the rear. I showed UA Harlan, c/o [illegible], Capt. Crawford, and Lt. Bare[.]" (DN 23-9). Plaintiff stated that he requested a PREA coordinator, to which Bare responded that it was not a PREA issue and advised

Plaintiff to file a grievance. Plaintiff wrote, "the staff along with inmates seen me on outside rec with my butt completely exposed along with camera's too. This was uncalled for when I previously asked Mrs. Long the U/A in RHU for bigger size . . . I asked for a month straight. I have been humiliated by me having to walk around with my buttocks exposed." (*Id*.).

Another grievance, marked received on July 23, 2020, stated "on the 16th of July my boxer's busted out and my whole butt was exposed while several inmates made sexual remarks at me about the butt being exposed. I showed several c/o's along with Ms. Crawford, and U/A Harlan and I/A bare to file a Grievance." (DN 23-11). Under the section entitled "Informal Resolution Stage," Long wrote:

> On 8-5-20 I UA Long spoke with Cpt. Crawford, UA Harlan, and Lt. Bare. All staff verified that paper boxers (plus size) were on back order but however temporarily supplied Turner with a regular pair of boxers until the paper boxers arrived. Staff also advised Turner . . . that his allegation was not a PREA incident that warranted a PREA investigation for . . . (due to inmate making one time sexual remarks).

(DN 23-11).

The evidence presented by Plaintiff, viewed in the light most favorably to him, suggests that Bare may have had a role in the alleged constitutional deprivation—the withholding of his cloth boxers in the absence of suitably-sized paper boxers—however the extent to which is unclear on this record. This is sufficient to create a genuine dispute as to the extent of Bare's involvement. *See Otrusina v. Crysler*, No. 209-CV-12828, 2010 WL 3702647, at *7 (E.D. Mich. July 29, 2010), *report and recommendation adopted,* No. 09-12828, 2010 WL 3702646 (E.D. Mich. Sept. 16, 2010) ("These allegations go beyond a mere failure to supervise or respond to plaintiff's complaints, and allege that defendant Crysler himself personally participated in the seizure of plaintiff's property and the amendment of plaintiff's medical detail.").

Because the record establishes a question of fact as to whether Bare had sufficient personal involvement in the alleged wrongdoing, the Court finds summary judgment inappropriate as to Defendant Bare on this basis.

### B. Fourth Amendment—Bodily Privacy

Defendants move for summary judgment as to Plaintiff's Fourth Amendment bodily privacy claim on the grounds that LLCC's Clothing Policy is valid, Defendants' denial of cloth boxers to Plaintiff was not unconstitutional, and that Defendants are entitled to qualified immunity. (DN 55-1, PageID.531).

It well-settled that the Sixth Circuit recognizes that "a convicted prisoner maintains some reasonable expectations of privacy while in prison . . . even though those privacy rights may be less than those enjoyed by non-prisoners." *Cornwell v. Dahlberg*, 963 F.2d 912, 916 (6th Cir. 1992) (citing *Bell v. Wolfish*, 441 U.S. 520, 558 (1979) and *Kent v. Johnson*, 821 F.2d 1220, 1226–27 (6th Cir. 1987)). As explained by the Sixth Circuit in *Kent v. Johnson*, "there must be a fundamental constitutional right to be free from forced exposure of one's person to strangers of the opposite sex when not reasonably necessary for some legitimate, overriding reason, for the obverse would be repugnant to notions of human decency and personal integrity." 821 F.2d at 1226. Thus, "a prison policy forcing prisoners to . . . be exposed to regular surveillance by officers of the opposite sex while naked—for example while in the shower or using a toilet in a cell—would provide the basis of a claim on which relief could be granted." *Mills v. City of Barbourville*, 389 F.3d 568, 579 (6th Cir. 2004). "In contrast, accidental viewing of a prisoner's naked body by a prison guard of the opposite sex is not a constitutional violation." *Jones v. Lawry*, No. 2:19-CV-49, 2019 WL 2482361, at *7 (W.D. Mich. June 14, 2019) (citing *Mills*, 389 F.3d at 579).

### *1. The RHU Clothing Policy*

In its remand order, the Sixth Circuit instructed this Court to evaluate LLCC's Clothing Policy under the standard articulated by *Turner v. Safley*, 482 U.S. 78 (1987). *Turner v. Long*, No. 23-5685, 2024 WL 3029249, at *4 (6th Cir. June 17, 2024).

"[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. at 89. This applies equally to prison regulations and unwritten prison policies. *Cornwell*, 963 F.2d at 917. Under *Turner v. Safley*, the following factors are relevant in determining the reasonableness of the regulation at issue, including (1) whether a "valid, rational connection" exists between the prison regulation and the legitimate governmental interest put forward to justify it; (2) the existence of an alternative means for inmates to exercise their constitutional right; (3) the impact that accommodation of the constitutional right will have on guards and other inmates, and on the allocation of prison resources; and (4) the absence of ready alternatives as evidence of the reasonableness of a prison regulation. 482 U.S. at 89-90; *Cornwell*, 963 F.2d at 917. *Turner v. Safley* mandates that judicial deference is to be given to the decisions of prison administrators. 482 U.S. at 90.

As applied to this case, the Sixth Circuit directed this Court to examine:

> 1) whether LLCC had a legitimate governmental interest in forcing RHU inmates to wear paper boxers where the RHU written policy was based on concerns about suicide attempts, the RHU housed inmates for many reasons not related to suicide, and the unwritten paper-boxer policy had no stated justification, as the defendants wrongly believed it was part of the RHU written policy; 2) whether Turner could exercise his right to privacy in spite of the RHU paper-boxer policy; 3) the impact that letting Turner wear his personal cloth underwear would have had on guards and other inmates; and 4) the absence of ready alternatives as evidence of the reasonableness of a prison regulation.

*Turner v. Long*, 2024 WL 3029249, at *5.

### a. Legitimate Penological Interest

Defendants assert that the RHU Clothing Policy, including the issuance of paper boxers, was rationally related to the legitimate government interest of suicide prevention. (DN 55-1, PageID.532-34).

While it is true that suicide prevention is a legitimate penological interest, *see generally Holloway v. Mason*, 948 F.2d 1289 (6th Cir. 1991) (in right-to-privacy context, "[p]risoner safety and security are legitimate penological interests") (citing *Whitney v. Brown*, 882 F.2d 1068, 1073 (6th Cir. 1989)), the Court is tasked with examining whether a valid, rational connection exists between the RHU Clothing Policy as understood and carried out by Defendants (which included the withholding of cloth underwear in the absence of paper boxer availability), which is applied to all inmates in RHU regardless of suicidal ideation, and the broadly-stated justification of suicide prevention.

The evidence submitted by Defendants reflects that the RHU Clothing Policy from 2018 directs that all inmates housed in RHU, regardless of the reason for placement, were to be issued security smocks and security blankets. (DNs 32-13, 55-2). Although not written in the Policy Memorandum (DN 32-13), Defendants understood the Clothing Policy to include issuance of paper boxer shorts. (DNs 32-10, 32-13, 55-2, 55-3, 55-4). Further, the evidence of record suggests that Defendants understood the Policy to prohibit cloth boxers, even when paper boxer shorts were unavailable to inmates, instead relying on suicide smocks that reached to mid-thigh and security blankets to provide sufficient bodily coverage to inmates.

Defendants state that the rationale behind this policy was due to the increase of suicide attempts at LLCC. Then-Warden Scott Jordan attests that inmates in the RHU had used bed sheets,

jump suits, and cloth boxer shorts tied together as a means to attempt suicide.  Per Jordan, the policy was implemented such that safety smocks, paper boxer shorts, and safety blankets could not be fashioned into a noose or hanging tool.  (DN 55-2).  He states that the Clothing Policy was uniformly applied because the RHU at LLCC was a "double bunk" segregation unit.  Thus, even if an inmate has no mental health diagnosis or suicidal ideation, his cellmate could, and could ostensibly use the clothing or bedsheets of his cellmate to hang himself.  Moreover, "inmates in the RHU are also exposed to other inmates, making it possible for other inmates to provide them with clothing or bedsheets."  (*Id.*).  Jordan states that the RHU Clothing Policy was a safety and security measure that was effective insofar as the suicide attempts in RHU dropped substantially after its implementation.  (*Id.*).

Plaintiff challenges Defendants' rationale, arguing that "taking underwear away from incarcerated people who have never been assessed a suicide risk is not in any way tailored to the institution's interest in preventing suicide."  (DN 60, PageID.595) (citing *Turner v. Safley*, 482 U.S. at 89-90).  Plaintiff further argues that Defendants undermined their own justification by providing Plaintiff with cloth boxers—demonstrating that the legitimate penological need purported by Defendants was "non-existent."  (*Id.*).

Plaintiff does not squarely address Defendants' evidence that both suicidal and non-suicidal inmates were co-mingled and double-bunked in the RHU, and therefore does not place this evidence in dispute.

Mindful that the RHU Clothing Policy is entitled to deference under *Turner v. Safley*, and given Defendants' uncontroverted explanation that a portion of the RHU population suffers from mental health issues or suicidal tendencies, and that those inmates are in contact with other, non-suicidal inmates, the Court might discern a rational connection between the RHU Clothing Policy

of issuing suicide smocks, security blankets, and paper boxer shorts and the penological interest of inmate safety and suicide prevention. Were that the end of the inquiry, the RHU Clothing Policy could indeed be facially valid. However, as discussed below, LLCC's unwritten policy and practice of the withholding of undergarments entirely from Plaintiff in the absence of suitably-sized paper boxers was an exaggerated response to the articulated justification by Defendants under the remaining *Turner v. Safely* elements.

### b. Alternative Means

Defendants assert that Plaintiff had alternative means of exercising his right to bodily privacy: a security blanket and security smock that covered an individual to the mid-thigh. (DN 55-1, PageID.535; DNs 55-3, 55-4). The security smock, as pictured in Defendants' evidence in their previous motion for summary judgment (DN 32-11), appears to be a quilted sleeveless gown with a frontal opening containing seven horizontal Velcro fasteners for opening and closing the gown. Intended to cover prisoners to mid-thigh, the wearer is nude beneath the gown in the absence of paper or cloth undergarments.

Plaintiff, in contrast, states that "the smock would not stay closed because the Velcro was not strong enough and/or poor quality" sufficient to cover a larger individual, and that the smock would "ride up," thus exposing his buttocks and/or genitals. (DN 33). He observes that the photograph submitted by Defendants does not represent the smock being worn by a "400 pound man[.]" (*Id.*).

The parties' divergent characterizations of the level of bodily coverage provided by the suicide smock presents a factual dispute as to whether Plaintiff had alternative means of exercising his right to bodily privacy, precluding summary judgment.

c. <u>Accommodation Burden</u>

The third *Turner v. Safley* factor—the impact that accommodating privacy rights may have on guards, inmates, and prison resources—weighs in favor of Plaintiff.

Defendants conjecture that allowing Plaintiff to wear his own cloth boxers "could have been catastrophic," such that the presence of cloth boxers in the RHU poses a danger to inmates regardless of whether they are suicidal or not. (DN 55-1, PageID.536). However, the fact remains Defendants did provide Plaintiff with cloth boxers while the paper XXXL boxers were on backorder, and do not present evidence that doing so presented a safety risk to inmates in the RHU. To the contrary, the evidence demonstrates that Plaintiff wore his cloth boxers without issue until his appropriately-sized paper boxers arrived.[2]

d. <u>Ready Alternative</u>

The fourth *Turner v. Safley* element, whether an alternative was available and readily implemented, also weighs in favor of Plaintiff. Defendants point to the "success of the clothing policy in reducing, then eliminating the instances of suicide attempts [as] underscore[ing] the absence of a ready alternative (i.e., issuing cloth boxers to [Plaintiff]) to the clothing policy." (DN 55-1, PageID.536).

However, the record demonstrates that on July 16, 2020, Captain Crawford "retrieved a pair of Plaintiff's personal boxers out of his property and issued them to him. The personal boxers were washed frequently. A second pair of personal boxers was provided to him while his old ones [were] being washed." (DN 32-10). The evidence of record thus shows that a ready alternative not only existed but was approved and implemented without issue. As acknowledged by the Sixth

---

[2] In his affidavit, Jordan attests that, "[i]n attempting to hang themselves," suicidal inmates have "used bed sheets and state issued clothing. This included . . . cloth shorts tied together." (DN 55-2). However, Plaintiff was provided with a single pair of cloth boxers to wear while a second pair was laundered, thus mitigating the risk that another inmate might access multiple pairs of cloth boxers.

Circuit, Plaintiff's "personal XXXL-size cloth underwear were readily available, could have been provided at no cost to the prison, and ultimately were provided" to Plaintiff.   *Turner v. Long*, 2024 WL 3029249, at *5.

Additionally, Plaintiff's exhibits contain a grievance marked received on July 23, 2020. Therein, Plaintiff complained of his boxers being "busted out," leaving his "whole butt . . . exposed while several inmates made sexual remarks at me . . . ."  (DN 23-11).  A Grievance Committee response dated August 19, 2020, reads: "[t]his committee recommends that all sizes be kept in stock.  If an inmate's size is out of stock take 2 pairs to laundry and have one pair maid [sic].  And request the Warden review the policy on paper boxers." (*Id.*).[3]  Warden Amy Robey reviewed and agreed with the Grievance Committee's determination on September 3, 2020.  (*Id.*).  Thus, the record reflects the existence of two "obvious, easy alternatives[s]" that serve as evidence that the RHU Clothing Policy is not reasonable "but is an 'exaggerated response' to prison concerns." *Turner v. Safley*, 482 U.S. at 90 ("[I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.").

Ultimately, the factual disputes presented by the record affect the balancing outcome of the *Turner v. Safley* test, and the validity of the RHU Clothing Policy cannot be resolved as a matter of law.  Defendants have failed to demonstrate that there is no genuine issue of material fact—and the record lacks clear evidence—as to whether Plaintiff had an alternative means to exercising his right to bodily privacy.  As such, summary judgment is inappropriate on the Fourth Amendment bodily privacy claim stemming from the RHU Clothing Policy.

---

[3] The Court understands this recommendation to mean that if a larger sized paper boxer is out of stock, two smaller pairs can be fashioned/sewn into a larger pair from the same material.

The Court turns to whether the individual Defendants' denial of cloth boxers violated Plaintiff's Fourth Amendment right to bodily privacy.

### 2. *Denial of Cloth Boxers*

As stated above, the limited right to privacy retained by prisoners "protects them from being forced unnecessarily to expose their bodies to guards of the opposite sex." *Kent*, 821 F.2d at 1227. However, the accidental viewing of a prisoner's naked body by a prison guard of the opposite sex is not a constitutional violation. *Mills,* 389 F.3d at 579. Where a prison's regulations need only be "reasonably related to legitimate penological interests," *Turner v. Safley*, 482 U.S. at 89, courts "review a correctional officer's discretionary actions under essentially the same deferential standard." *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 572 (6th Cir. 2013). The "reasonableness" standard under the Fourth Amendment requires the reviewing court to "first examine the scope, manner, and location of the search—as well as the justification for initiating it—in order to assess the degree to which it invaded the prisoner's right to privacy." *Stoudemire,* 705 F.3d at 572. It must then "evaluate the need for the search, giving due deference to the correctional officer's exercise of her discretionary functions." *Id.* Finally, the court must "determine whether the search was reasonably related to legitimate penological interests by weighing the need against the invasion." *Id.*, *see also Bell*, 441 U.S. at 559.[4]

---

[4] As noted by the appeals court, the Sixth Circuit "has considered a prisoner's right to privacy most often in the context of strip-search cases." *Turner v. Long*, 2024 WL 3029249, at *4. However, courts within this Circuit have applied the same Fourth Amendment principles in both "strip search" cases and those that involve the surveillance or visual observation of inmates and detainees in various states of undress. *See Kent*, 821 F.2d at 1226 (explaining, "[p]laintiff's right to privacy claim is characterized as deriving from the fourth amendment . . . . Literally, the issue is the reasonableness of the surveillance by female prison guards of plaintiff's person in various states of undress. Couched in fourth amendment terms, the inquiry becomes whether plaintiff has a reasonable expectation of privacy from such 'searches.'"); *Johnson v. City of Kalamazoo*, 124 F. Supp. 2d 1099, 1104 (W.D. Mich. 2000) (practice of requiring detainees to disrobe and be confined only in their underwear as a suicide prevention measure did not violate Fourth Amendment privacy expectations); *Rose v. Saginaw Cnty.*, 353 F. Supp. 2d 900, 922 (E.D. Mich. 2005) (policy requiring confinement in the nude unreasonable under the Fourth Amendment); *Wilson v. City of Kalamazoo*, 127 F. Supp. 2d 855, 861 (W.D. Mich. 2000) (removal of suicide gown and underclothing impinged on Fourth Amendment privacy rights). Accordingly, the strip search jurisprudence of this Circuit is instructive to address other bodily privacy concerns.

Defendants argue that, in withholding Plaintiff's cloth boxers while the XXXL paper boxers were backordered, the nature of intrusion upon his bodily privacy was minor, the safety concerns behind the RHU Clothing Policy were a legitimate penological justification, and that, on balance, the actions of Defendants were reasonable under the Fourth Amendment. (DN 55-1, PageID.537-41).

Defendants rely on the presence of Plaintiff's security smock in support of their argument that the degree of invasion was minimal, because with the smock, "any exposure of [Plaintiff's] person would be fleeting and incidental." (DN 55-1, PageID.538). Moreover, excepting showers, Plaintiff was only outside of his cell for one hour per day on weekdays. And on July 16, 2020, Plaintiff removed his smock during recreation causing his own exposure. (*Id.*).

Defendant Long attests that she does not recall any inappropriate comments by inmates or staff toward Plaintiff regarding his exposed lower half and never observed Plaintiff's "private parts" being exposed, in that the security smock "covered his body completely to his mid-thigh." (DN 55-3).

Captain Crawford states that on July 16, 2020, she responded to the recreation area upon Plaintiff's request. Plaintiff advised her that his boxer shorts were "ripped due to them being too small." (DN 32-10). Plaintiff was "laughing and kind of joking about it." (*Id.*). Plaintiff pulled up his smock to show Crawford the shorts, and she "observed that the boxers had a small rip. No skin was showing, nor were [his] private parts exposed." (*Id.*). Nonetheless, Crawford advised prison officials of the situation, and she was authorized to issue Plaintiff a pair of his personal boxers until the plus size paper boxers arrived. (*Id.*).

Plaintiff, in contrast, states that his XXXL paper boxers had been "falling apart" by June 29, 2020. By wearing the disintegrating boxers, Plaintiff was exposed for several weeks

18

inside of his cell where he was monitored by officers and viewed by his cellmates. (DN 1-1, PageID.16; DN 1, PageID.5; DN 33). When Defendants provided Plaintiff with the size-L or XL boxers, they were so small that he "could not pull them up all the way" and they immediately ripped at the seam once he sat down. (DN 1, PageID.5-6; DN 33). Thus, Plaintiff alleges that his buttocks and genitals were exposed again when the smaller-sized paper underwear failed on July 15, 2020. (DN 1, PageID.6).

Plaintiff states he wore the torn, smaller-sized boxers during recreation on July 16, 2020, where Defendants Harlan and Bare taunted him with "rude comments," and other inmates made sexually explicit comments about Plaintiff's exposed buttocks. (DN 1, PageID.5-6; DN 33). Plaintiff maintains that he was exposed to Defendant Long and Captain Crawford, prison officials of the opposite sex. (*Id*.).

Drawing all reasonable inferences in his favor, as the Court must do, Plaintiff's affidavit and verified complaint offer some support for his claim that he was exposed to other inmates and female employees. Plaintiff maintains that he was exposed from the waist down in view of two female prison officials and other inmates, *see Sumpter v. Wayne Cnty*., 868 F.3d 473, 483 (6th Cir. 2017) (defendant's "visual inspections of plaintiff's naked body, though only skin-deep, constituted a profound intrusion into her personal privacy, an intrusion only magnified by the fact that plaintiff was exposed to several other inmates during each search . . . ."), and that Defendants Harlan and Bare made inappropriate comments to him while other inmates heckled him with sexual remarks. *See id*. (lewd comments, "while not dispositive of reasonableness, implicate the dignitary interest inherent in the privacy component of the Fourth Amendment's proscription against unreasonable searches.") (internal quotations and citations omitted).

19

The parties disagree as to the facts pertaining to the extent of bodily coverage provided by the RHU-issued suicide smock and the smaller-sized, torn paper boxers. As such, the nature of the intrusion upon Plaintiff's privacy cannot be determined on the present record. Given the parties' factual dispute as to the level of Plaintiff's exposure, the Court cannot conclude that the intrusions were incidental or minimal.

As to the degree of need for the intrusion, Defendants assert that Long and Harlan did not deviate from the RHU Clothing Policy by providing Plaintiff his cloth boxers because "they were aware of the safety reasons underpinning the clothing policy, that is, RHU inmates using their clothing to attempt suicide" and that they "knew the larger sized boxers could arrive at any time." (DNs 55-3, 55-4).

However, the fact that Plaintiff was provided with the cloth boxers strongly suggests that the need for the invasion was not as profound as Defendants aver. Deputy Warden for Security Patricia Gunter attests that when she was informed that "the RHU had run out of boxers to fit exceptionally large inmates, and that these inmates could not comfortably fit into the smaller sized boxers in stock," she "authorized the RHU staff to allow those few inmates to wear their own personal cloth boxers until the large sized paper boxers were restocked." (DN 32-12). Moreover, the Grievance Committee's response to Plaintiff's grievance appeal indicates that yet another alternative was available. (DN 23-11). Despite these alternatives, Plaintiff was faced with a choice between disintegrating paper boxers, paper boxers that were several sizes too small, or simply going without undergarments, without having been assessed a suicide risk. Thus, Defendants' withholding of Plaintiff's cloth boxers—essentially forcing his exposure—is not compelling to balance the safety needs of suicidal inmates. Stated somewhat differently, a reasonable factfinder

20

could conclude that forcing Plaintiff to go without undergarments in his shared cell and in the recreation yard exceeded a justified response to the suicide concerns in the RHU.

Here, Plaintiff produces evidence that would allow a reasonable jury to question or disregard Defendants' justifications for withholding his cloth boxers, *i.e.*, whether Defendants' refusal to provide some covering for Plaintiff would be necessary to prevent inmate suicide given the demonstrated alternatives available. *See Sumpter*, 868 F.3d at 484 (in light of the deference accorded to jail officials, substantial evidence is needed to show that the asserted penological justifications were exaggerated) (citing *Bell*, 441 U.S. at 548).

Thus, the Court finds that there is, especially when taken in the light most favorable to Plaintiff, a genuine issue of material fact about the reasonableness of Defendants' actions in denying Plaintiff his cloth boxer shorts.

For these reasons, the Court finds that Defendants are not entitled to summary judgment on the Fourth Amendment bodily privacy claim based on the individual Defendants' withholding of Plaintiff's cloth boxer shorts while in RHU.

The Court next turns to Defendants' assertion of qualified immunity as to the Fourth Amendment bodily privacy claim.

### 3. *Qualified Immunity*

Under the doctrine of qualified immunity, "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Thus, a defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a

constitutional right; and (2) the right was clearly established." *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011). Once the qualified immunity defense has been raised, "the burden shifts to the plaintiff, who must demonstrate both that the official violated a constitutional or statutory right, and that the right was so clearly established at the time of the alleged violation 'that every reasonable official would have understood that what he [was] doing violate[d] that right.'" *Thomas v. Plummer,* 489 F. App'x 116, 119 (6th Cir. 2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). As relevant to this case, "the Fourth Amendment inquiry is fact-intensive, so prior case law establishing a violation must present fairly similar facts such that a defendant would be on notice that they are committing a constitutional violation." *Woodall v. Wayne Cnty*., 590 F. Supp. 3d 988, 1003 (E.D. Mich. 2022).

Defendants argue that, even if Plaintiff's right to bodily privacy was violated, they are shielded by qualified immunity because the right at issue was not clearly established at the time of the incident. (DN 55-1, PageID.541-44). Because triable issues of fact remain as to whether a Fourth Amendment violation occurred, the Court examines whether the right Plaintiff asserts was clearly established.

Plaintiff relies on *Stoudemire* and *Sumpter* as setting forth the clearly established right to be free from unnecessary bodily exposure, whether same or opposite-sex. (DN 60, PageID.598). Defendants counter that these cases are factually distinguishable and therefore do not govern the situation presented in this case because those cases involved public strip searches without penological justification. Defendants state that Plaintiff had a security smock for coverage and that withholding the cloth boxers was justified by a legitimate penological need. (DN 61, PageID.609-10).

To fully address the parties' arguments, the Court summarizes the relevant caselaw in this Circuit.

*Kent v. Johnson*, cited by the appeals court in *Turner v. Long*, 2024 WL 3029249, at *4, held that a prisoner may bring a Fourth Amendment right-to-privacy challenge to prison officials' policy of allowing opposite-sex guards to routinely observe inmates while nude and performing bodily functions without restriction. Thus, there is a right to be free from the forced exposure of a prisoner's naked body to strangers of the opposite sex. *Kent*, 821 F.2d at 1226; *accord Brannum v. Overton Cnty. School Bd.*, 516 F.3d 489, 495 (6th Cir. 2008) ("Before *Kent*, we had not articulated the Fourth Amendment's protection as extending to the right to shield one's naked body from view by members of the opposite sex. But, since *Kent*, we have recognized this privacy right."). *Kent* examined Plaintiff's claim of unreasonable observation under the Fourth Amendment lens of unreasonable searches. 821 F.2d at 1226 ("Literally, the issue is the reasonableness of the surveillance by female prison guards of plaintiff's person in various states of undress. Couched in fourth amendment terms, the inquiry becomes whether plaintiff has a reasonable expectation of privacy from such 'searches.'").

*Cornwell v. Dahlberg*, *supra*, held that an inmate had a Fourth Amendment privacy interest that may have been violated where male prisoners were strip searched outside in the prison yard in the presence of other inmates and female officers, reiterating that "a convicted prisoner maintains some reasonable expectations of privacy while in prison, particularly where those claims are related to forced exposure to strangers of the opposite sex[.]" 963 F.2d at 916.

The district court in *Rose v. Saginaw County*, 353 F. Supp. 2d 900, 919-20 (E.D. Mich. 2005), decided in 2005, found that a county policy requiring confinement to administrative segregation in the nude was unreasonable under the Fourth Amendment, where the individual

might be detained for "relatively minor violations, there is no individualized suspicion of drug, weapon, contraband possession, and there is no indication that he or she is suicidal." *Id.* at 923. *Rose* granted qualified immunity to the County, however, finding that "the contours of the right to reasonable seizures . . . was not sufficiently clear to impose liability on individual actors following the County's policy [of stripping detainees completely naked] in effect during the period at issue in this case." *Id.* at 924. Specifically, "[a]t the time of the detentions in this case, there was no clear precedent that would have provided guidance to the individual defendants, who were attempting to walk the line between protecting detainees from harming themselves and violating their rights to personal privacy." *Id.* at 924.

*Wilson v. City of Kalamazoo,* 127 F. Supp. 2d 855 (W.D. Mich. 2000), another district court case, held that arrestees detained without any clothing or covering for between six and 18 hours, with at least limited exposure to viewing by members of the opposite sex, stated right-to-privacy claims under Fourth Amendment; even if they were deprived of clothing as a suicide prevention measure, the removal of their underclothing was not adequately justified. *Id.* at 859.

In addressing qualified immunity eight years later, the district court in *Mead v. Cnty. of St. Joseph*, No. 1:06-CV-555, 2008 WL 441129, at *11 (W.D. Mich. Feb. 13, 2008), found that the decision in *Wilson* "gave notice to officers that in certain circumstances stripping suicidal detainees can violate their constitutional rights," and thus, "[a]t the time of this incident Plaintiff's right not to be stripped of her clothing and bra by four opposite-sex officers without first being given the opportunity to change in private was clearly established." *Mead*, 2008 WL 441129, at *11.

*Stoudemire v. Michigan Dep't of Corr.*, *supra*, decided in 2013, extended *Kent*'s logic that even a brief exposure can be violative of an inmate's privacy rights unless justified by a pressing institutional safety or security need. *Stoudemire* thus established the "the right not to be subjected

24

to a humiliating strip search in full view of several (or perhaps many) others unless the procedure is reasonably related to a legitimate penological interest." 705 F.3d at 575. *Stoudemire* clarified that "[t]he gender of the parties is just one fact for the court to consider in determining the reasonableness of a given search or the legitimacy of a challenged practice" and is not dispositive. *Id*.

In 2017, *Sumpter v. Wayne Cnty., supra,* acknowledged "the clearly established right recognized in *Stoudemire*—[to be free from] a public strip search 'devoid' of justification," but found that it "could not have put a reasonable officer on notice that . . . a group strip search *supported* by a legitimate penological justification would be unconstitutional." *Sumpter*, 868 F.3d at 487.

In *Salem v. Michigan Dep't of Corr.*, No. 13-14567, 2015 WL 1966727, at *19 (E.D. Mich. May 1, 2015), *aff'd in part*, 643 F. App'x 526 (6th Cir. 2016), the district court rejected the defendants' qualified immunity argument that it was not clearly established law that a strip search performed by an officer of the same sex employing the use of a chair for a portion of the strip search was unconstitutional as "construing the constitutional right too narrowly." 2015 WL 1966727, at *19. The district court reasoned that, "in determining whether a clearly established right exists, 'there need not be a case with the exact same fact pattern or even fundamentally similar or materially similar facts; rather, the question is whether the defendants had fair warning that their actions were unconstitutional.'" *Id*. (quoting *Goodwin v. City of Painesville*, 781 F.3d 314, 324 (6th Cir. 2015) (internal quotations omitted)). And *Salem* observed that *Stoudemire* "rejected a similar attempt to narrowly construe the contours of a 'clearly established right' where the defendant official argued that a prisoner had no right to be free from a same-sex strip search under the Fourth Amendment." *Id.* (quoting *Stoudemire*, 705 F.3d at 574–75).

Finally, *Newsome v. Streeter*, No. 3:17-CV-245, 2018 WL 3819127, *6 (N.D. Ohio Aug. 10, 2018), cited by Defendants, reiterated that "[t]he clearly established right recognized in *Stoudemire* . . . was the right not to be subjected to "a public strip search," or "a humiliating strip search in full view of several (or perhaps many others)" without any justification. *Newsome v. Streeter*, No. 3:17-CV-245, 2018 WL 3819127, at *6 (N.D. Ohio Aug. 10, 2018), *aff'd*, No. 18-3927, 2019 WL 4842955 (6th Cir. July 3, 2019) (citations omitted). In *Newsome,* the factual record demonstrated that, in searching the plaintiff, the defendants attempted to obstruct the plaintiff from view, away from bystanders, and that there were "at least some exigent circumstances and individualized suspicion supporting the officers' decision to conduct the search quickly, perhaps in a less-than-ideal manner." *Id*. That court found that because "no case squarely govern[ed] this situation," the defendants were entitled to qualified immunity. *Id.*

Defendants aver that *Stoudemire* is inapposite because Plaintiff was: (1) not subjected to a public strip search; (2) wore a security smock that covered his torso to mid-thigh at all times; and (3) the withholding of his cloth boxers were justified in light of the safety reasons underpinning the RHU Clothing Policy. (DN 55-1, PageID.543). However, the Court does not read the caselaw as narrowly as Defendants, finding that *Kent* and *Stoudemire* clearly establish that inmates possess a limited privacy right against involuntary, unclothed exposure without legitimate penological justification. Thus, a reasonable officer would be on notice that the actions alleged here—placing Plaintiff in a situation where he is unclothed from the waist-down in the presence of jail staff and other inmates, for more than a brief period of time, without legitimate penological justification— were unconstitutional.

Notwithstanding that Plaintiff was not strip searched *per se*, he was nonetheless involuntarily subjected to an invasion of his bodily privacy by virtue of the RHU Clothing Policy

as written, as carried out, or both.  The extent of the invasion, *i.e.*, the level of Plaintiff's physical exposure and duration, is disputed by the parties.  And on the present record, Defendants failed to demonstrate that the need for the particular intrusion was reasonably related to the proffered legitimate penological justification.

Under *Kent* and *Stoudemire*, *supra*, Plaintiff has established that his limited right to privacy protecting him from the unnecessary waist-down exposure to strangers was clearly established. This right was clearly established when Defendants: (1) placed Plaintiff in paper underwear that did not support his size and tore upon use; (2) placed Plaintiff in a suicide smock without paper boxers that did not support his size and did not remain closed;[5] and (3) refused to provide Plaintiff with his own cloth underwear after being notified that he was insufficiently covered.  Whether Defendants acted reasonably under the circumstances is disputed given the extent and duration of the exposures, the number of individuals that viewed Plaintiff, Plaintiff's transport throughout the facility, and the quick-availability of his normal cloth underwear.

Therefore, the Court finds that Plaintiff has met his burden at summary judgment of showing that the constitutional right he asserts was clearly established under Sixth Circuit case law at the time of the alleged violation.  At this stage, qualified immunity does not shield Defendants from Plaintiff's Fourth Amendment claim.

### C.  Eighth Amendment—Conditions of Confinement

Defendants seek summary judgment on the grounds that Plaintiff does not state an Eighth Amendment violation based on the conditions of his confinement, specifically, the denial of clean

---

[5] Defendants rely heavily on the presence of the suicide smock in retaining Plaintiff's right to bodily privacy. Construing the facts and drawing all reasonable inferences in Plaintiff's favor, the Court notes that the unwritten provision of issuing paper boxer shorts as part of the RHU Clothing Policy suggests that the suicide smock alone may not sufficiently protect an inmate's bodily privacy.

underwear for approximately three weeks, and in the alternative, that they are entitled to qualified immunity on this claim.  (DN 55-1, PageID.544-52).

To establish an Eighth Amendment violation based on the conditions of confinement, an inmate must show that (1) he suffered a "sufficiently serious" deprivation and (2) a prison official acted with a "sufficiently culpable state of mind" in creating that condition.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citation omitted).  To satisfy the objective component, Plaintiff must show that the denial of proper hygiene elements or sanitary conditions—in this case, clean boxer shorts—was "sufficiently serious," *i.e.*, that his conditions posed a "substantial risk of serious harm."  *Farmer*, 511 U.S. at 834.  To satisfy the subjective component, Plaintiff must show that Defendants had a "sufficiently culpable state of mind."  *Farmer*, 511 U.S. at 834.  "In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety."  *Id*.  This standard requires that the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id*. at 837.

"In the context of 'conditions of confinement' cases, the Eighth Amendment is concerned only with 'deprivations of essential food, medical care or sanitation' or 'other conditions intolerable for prison.'"  *Flanory v. Bonn*, 604 F.3d 249, 253 (6th Cir. 2010) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).  Thus, the Eighth Amendment protects prisoners from being denied "the basic elements of hygiene."  *Parrish v. Johnson*, 800 F.2d 600, 609 (6th Cir. 1986) (citation omitted).  And poor sanitary conditions, particularly those related to human waste, can establish a constitutional violation.  *See Taylor v. Larson,* 505 F. App'x 475, 477 (6th Cir. 2012).

Plaintiff contends that an Eighth Amendment violation arose when he was "compelled to wear the same nasty, urine and feces stained and molded paper boxers for over three weeks."

(DN 60, PageID.586). He cites the Supreme Court's recent decision in *Taylor v. Riojas*, 592 U.S. 7, 8 (2020), for the proposition that an Eighth Amendment violation arose where defendant corrections officers left a prisoner in his own filth for six days, a period of time far less than the 22 days at issue here. (*Id*.).

*Taylor v. Riojas* addressed an inmate's exposure to feces in his cell, vacating the Fifth Circuit's affirmance of summary judgment on qualified immunity grounds. Therein, the Supreme Court described the conditions as follows:

> Correctional officers confined [the inmate] in a pair of shockingly unsanitary cells. The first cell was covered, nearly floor to ceiling, in "'massive amounts' of feces": all over the floor, the ceiling, the window, the walls, and even "'packed inside the water faucet.'" *Taylor v. Stevens*, 946 F.3d 211, 218 ([5th Cir.] 2019). Fearing that his food and water would be contaminated, Taylor did not eat or drink for nearly four days. Correctional officers then moved Taylor to a second, frigidly cold cell, which was equipped with only a clogged drain in the floor to dispose of bodily wastes. Taylor held his bladder for over 24 hours, but he eventually (and involuntarily) relieved himself, causing the drain to overflow and raw sewage to spill across the floor. Because the cell lacked a bunk, and because Taylor was confined without clothing, he was left to sleep naked in sewage. *Id.* at 53 (footnote omitted).

*Taylor v. Riojas*, 592 U.S. at 7-8. The Supreme Court held that no reasonable correctional officer could have concluded that it was constitutionally permissible to house the plaintiff under those conditions. *Id.* at 8-9.

"Conditions-of-confinement cases are highly fact-specific, but one guiding principle is that the length of exposure to the conditions is often paramount." *Lamb v. Howe*, 677 F. App'x 204, 209 (6th Cir. 2017) ("In general, the severity and duration of deprivations are inversely proportional, so that minor deprivations suffered for short periods would not rise to an Eighth Amendment violation, while 'substantial deprivations of shelter, food, drinking water, and

sanitation' may meet the standard despite a shorter duration.") (quoting *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001)).

As Defendants point out, the facts of this case involve a lack of clean, sanitary boxer shorts, and not unsanitary conditions of his cell. (DN 61, PageID.610-11). However, the cases involving inmates' exposure to fecal matter are illustrative for purposes of the present motion. In this regard, "[i]t is well-established that the presence of some unsanitary conditions in a cell (including fecal matter) does not establish an Eighth Amendment claim, except in circumstances where the volume of matter and duration of exposure are extreme." *Edge v. Mahlman,* No. 1:20-CV-892, 2021 WL 3725988, at \*3 (S.D. Ohio Aug. 23, 2021), *report and recommendation adopted*, No. 1:20-CV-892, 2022 WL 20113138 (S.D. Ohio Mar. 18, 2022). As stated above, allegations that a prisoner was consistently exposed to fecal matter for days are sufficient to state an Eighth Amendment claim. *Taylor v. Riojas*, 592 U.S. at 8 (concluding that a prisoner who alleged that he was placed in "shockingly unsanitary" cells for six days, one of which was covered in "massive amounts" of feces and the other of which was equipped with only a clogged drain to dispose of bodily waste, stated a violation of the Eighth Amendment); *Taylor v. Larson*, 505 F. App'x 475 (6th Cir. 2012) (finding a question of fact as to the prisoner's Eighth Amendment claim where the prisoner alleged that he was confined to a cell covered in fecal matter for three days); *DeSpain*, 264 F.3d at 974 (holding that exposure to non-working toilets and other inmates' urine and feces via standing water for thirty-six hours was sufficiently serious).

These cases involve plaintiffs who were involuntarily and continuously subjected to extreme and hazardous conditions. For example, in *Parrish,* the Sixth Circuit held that the plaintiffs stated Eighth Amendment violations where two paraplegic, incontinent prisoners with little or no ability to clean themselves were "regularly" or "routinely" left sitting in their own feces

for significant periods of time, causing risk of infection. 800 F.2d at 611. In contrast, Plaintiff's allegations fail to describe extreme conditions like those proscribed by *Taylor v. Riojas* and *Parrish*.

There is little evidence in the record describing the sanitary condition of Plaintiff's boxers. A July 1, 2020, grievance indicates that he complained to LLCC officials that his boxers were dirty and stained with urine and feces. (DN 23-8). He also asserts that his boxers were moldy and had a foul odor, such that his cellmate complained about "the smell and health hazard it posed." (DN 1, PageID.5, 8, 11). Plaintiff provides few details regarding the conditions he was subjected to, such as the extent of any contamination or the effects therefrom. Based on his allegation that he wore his XXXL paper boxers that were stained with urine and feces for 22 days because he was not provided with either his own cloth boxers or appropriately-sized paper boxers, the Court finds these conditions insufficient to meet the objective component of the deliberate indifference test. *See Johnson v. Cool*, No. 1:22-CV-00031, 2024 WL 3992412, at *10-11 (S.D. Ohio Aug. 29, 2024), *report and recommendation adopted*, No. 1:22-CV-31, 2025 WL 360607 (S.D. Ohio Jan. 31, 2025) (no access to a "shower, water to wash his hands, sanitizer wipes, a mattress, undergarments," for 21 days and 14 days in only an unclean suicide gown without undergarments did not constitute objectively serious harms); *Taylor v. Wright*, No. 20-13041, 2023 WL 5822761, at *2–3 (E.D. Mich. Apr. 19, 2023) (twenty-day stay in a dirty cell combined with a denial of clean clothes and cleaning supplies not violative of the Eighth Amendment); *Newell v. Watson*, No. 1:14-CV-304, 2016 WL 1254355, at *8 (E.D. Tenn. Mar. 29, 2016) (allegations that "the bedding is stained and stinking due to mold, and the inmates' underwear is only washed every two weeks" were insufficient to state an Eighth Amendment claim); *Watison v. Perry*, No. 23-5059, 2024 WL 3461194, at *1-3 (6th Cir. Feb. 15, 2024) (affirming grant of summary judgment where plaintiff

31

alleged that his "genital area itched because he could not change his underwear" due to eight-day deprivation of personal hygiene supplies, showers, and clothing, finding that the conditions "were simply not so severe as to violate the Eighth Amendment.").

Moreover, although Plaintiff asserts that he was not provided clean boxers for 22 days, he does not allege that he was unable to remove them or that he could not clean himself during this time. *See  Spoors v. HCH*, No. 1:22-CV-1149, 2023 WL 2494393, at *7 (W.D. Mich. Mar. 14, 2023) (plaintiff failed to state conditions of confinement claim based on soiled undergarments, where she did not contend that she was forced to wear them or that she was unable use the sink to clean herself); *see also Passmore v. Josephson*, 376 F. Supp. 3d 874, 882 (N.D. Ill. 2019) (holding that inmate failed to state a claim for unconstitutional conditions of confinement based upon dirty underwear where the plaintiff was not forced to wear them).  It is also undisputed that Plaintiff was offered clean, smaller-sized boxers on shower days, but declined.  Plaintiff alleges that when he attempted to wear the smaller boxers offered by Defendants they ripped immediately.  However, in the context of unsanitary conditions, "a torn uniform, might cause Plaintiff to suffer some incidental indignity, but it does not implicate any threat to his health or safety, and thus, is not a violation of constitutional magnitude." *Marlow v. Blount Cnty. Jail*, No. 3:21-CV-151-DCLC-HBG, 2021 WL 2594793, at *4 (E.D. Tenn. June 24, 2021) (conditions of confinement claim). Finally, Plaintiff does not allege any deleterious effects from wearing the moldy and stained underwear for 22 days.  *See Spoors*, 2023 WL 2494393, at *7 (plaintiff did not allege that she suffered or was at risk of suffering any physical harm from soiled undergarments).

In this case, the type and severity of the conditions Plaintiff alleges do not establish an Eighth Amendment violation.  While these conditions may have been unpleasant, they do not rise to the level of a constitutional infirmity.  *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (noting

that "extreme deprivations are required to make out a conditions-of-confinement claim"); *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (the Constitution "does not mandate comfortable prisons," and "only those deprivations denying the minimal civilized measure of life's necessities . . . are sufficiently grave to form the basis of an Eighth Amendment violation.") (internal quotations and citations omitted).

Accordingly, the Court finds that Plaintiff has failed to establish an Eighth Amendment violation based on unsanitary conditions of his confinement arising from Defendants' denial of his cloth underwear. Having concluded that Defendants are entitled to summary judgment on this basis, it need not reach their argument that they are qualifiedly immune from suit as to Plaintiff's Eighth Amendment prison conditions claim.

## IV. CONCLUSION

For the reasons set forth herein, and the Court being otherwise sufficiently advised, **IT IS ORDERED** that Defendants' motion for partial summary judgment (DN 55) is **GRANTED IN PART** and **DENIED IN PART**. The motion is granted as to the Plaintiff's Eighth Amendment conditions of confinement claim, which is dismissed against all Defendants. It is denied as to Plaintiff's Fourth Amendment bodily privacy claim, which will proceed against all Defendants.

The following claims remain: Plaintiff's Fourth Amendment bodily privacy claim against Defendants Long, Harlan, and Bare, and Plaintiff's Eighth Amendment deliberate indifference/failure to protect claim against Defendant Bare.

By separate Order, the Court will refer this matter to the Magistrate Judge for purposes of conducting a status conference and scheduling discovery.

Date:   August 1, 2025

*Joseph H. McKinley*

Joseph H. McKinley Jr., Senior Judge

United States District Court

cc:      Counsel of Record
4414.015

34